# Mary E. Sutton v. Edward Dudley, Heulings Lippincott and Francis H. Hoffecker, Appellants.

*Corporation—Fraud—Mortgage—Powers.*

Where a corporation assists an insolvent debtor in fraudulently concealing his assets by taking from him assignments and transfers of his property, and subsequently the creditors of the insolvent debtor, by means of attachments and executions, tie up the assets and business of the corporation, the directors of the corporation may enter into a valid agreement with the creditors to pay to them their debt, and also to pay their counsel fees and expenses and secure the latter by the assignment of a mortgage. In such a case it is immaterial that the creditors' counsel had submitted no bill to their clients before demanding their fees from the corporation, and it is also immaterial in the absence of fraud whether or not the fees were excessive.

*Contract—Surrender of doubtful claim—Consideration.*

The surrender of a doubtful claim of right is a good consideration for a contract.

Argued May 15, 1899. Appeal, No. 194, Jan. T., 1898, by defendants, from decree of C. P. Lancaster Co., Equity Docket No. 3, page 145, on bill in equity. Before GREEN, McCOLLUM, MITCHELL, DEAN and FELL, JJ. Reversed.

Bill in equity to cancel the assignment of a mortgage. Before BRUBAKER, J.

The Real Estate Guarantee and Investment Company (see next succeeding case) averred its incorporation by special act of the legislature of Delaware as the Sussex Land and Cattle Company; that by special act its name was changed to the Real Estate Guarantee and Investment Company of Delaware; that it was the owner of a certain bond and mortgage for $30,000 made by one Rheiner to Levi H. Miller, secured on lands in Lancaster county; that, without authority from the board of directors of the complainant corporation or its stockholders, the president and secretary of the corporation complainant assigned the bond and mortgage to Edward Dudley, of Camden, New Jersey, without consideration; that he subsequently assigned the bond and mortgage to the defendants Lippincott and Hoffecker, who were proceeding to foreclose the same in the com-

mon pleas of Lancaster county; that the defendants had no right or title to the ownership of the mortgage, and the complainant prayed that they be enjoined from further proceeding in the foreclosure, and that they be directed to assign the bond and mortgage to the complainant.

The bill of complaint in this case contains the same averments, with the exception that the complainant averred that she was the owner of 25,800 shares of the capital stock of the complainant corporation, and as a stockholder claimed on behalf of the corporation the same relief which has already been mentioned.

To both bills of complaint the defendants filed answers admitting the corporate existence and the ownership of the bond and mortgage for $30,000 at one time by the corporation, but alleging that the assignment was for a full and sufficient consideration, not in fraud of the rights of the complainant, but executed and delivered by the officers of the corporation pursuant to authority vested in them by the board of directors of the corporation.

The facts appear by the opinion of the Supreme Court.

*Error assigned* was the decree of the court.

*Richard C. Dale,* for appellants.—The entire transaction was one transaction. It was legal, and eminently fair. By it Miller and Sutton secured the payment of their indebtedness to the amount of $100,000, the corporation secured a release of the land which formed its corporate assets, and Mrs. Miller and Mrs. Sutton were enabled to have issued to them a certificate for 25,800 shares of the capital stock, as to which, the interest of the banks having been released, they thereby obtained a lawful title.

The only question which the court has to consider is whether or not the assignment of the mortgage to Dudley as trustee, to secure the counsel fees and disbursements, was executed under the authority of the resolution of the board of directors, and for a consideration which the law will recognize as not fraudulent.

*William H. Keller* and *John J. Ridgway,* with them *H. M. North,* for appellees.—The directors of a corporation have no

authority to give away the assets of the company, and any device to secure that effect will be estopped and prevented: Thompson's Commentaries on Corporations, sec. 3995; Penna. Safe Deposit & Trust Co. v. Stetson, 175 Pa. 160; Bedford R. R. Co. v. Bowser, 48 Pa. 37.

The court below heard the witnesses orally and held the charge of fraud to be fully sustained, and it is well settled that the findings of fact of the court, sitting as a chancellor, founded on competent evidence, will not be disturbed, nor the testimony nicely weighed, nor statements of contradictory witnesses closely compared by the Supreme Court: Hancock v. Melloy, 187 Pa. 371; Com. v. Stevens, 178 Pa. 543; Stockett v. Ryan, 176 Pa. 71; Steinmeyer v. Siebert, 44 W. N. C. 61.

If the stock was Miller's the attempt to attach and sell in Pennsylvania the stock of a Delaware corporation belonging to a resident of Delaware, and not in the jurisdiction of the court, was illegal, and the sale passed no title: Christmas v. Biddle, 13 Pa. 223; Plimpton v. Bigelow, 93 N. Y. 592; Winslow v. Fletcher, 53 Conn. 390; Greenwood v. Mfg. Co., 13 W. N. C. 447; Weaver v. Manville, 21 Pa. C. C. R. 318; Cook on Stock and Stockholders, sec. 485.

And as a stockholder plaintiff had a right to file her bill: Thompson on Corporations, sec. 4520; South-West Gas Co. v. Fuel-Gas Co., 145 Pa. 16; Wardell v. R. R. Co., 103 U. S. 651.

OPINION BY MR. JUSTICE DEAN, October 6, 1899:

The bill in this case was filed by plaintiff to compel. defendants, by proper decree, on the facts averred by her, to assign a certain bond in sum of $30,000 secured by mortgage upon land in Warwick township, Lancaster county, to the Real Estate Guarantee and Investment Company of Delaware. The learned judge of the court below has set out twenty distinct findings of fact, on which he bases most elaborate legal conclusions. It is manifest to us that a large number of these findings are wholly immaterial, because they have no bearing on the issue raised by the bill and answer. By not eliminating things not material the learned judge permitted himself to be lured into disquisitions on, and application of legal and equitable principles, wholly outside the case.

The issue is a narrow one. The complainant avers : 1. That

the Real Estate Guarantee and Investment Company was the owner of the $30,000 bond and mortgage. 2. That without consideration and without corporate authority, the president and secretary, impelled thereto by the fraud of defendants, assigned this security to Edward Dudley, who afterwards assigned it to Lippincott and Hoffecker. 3. That no right or title passed to defendants by the transfer, and therefore, in equity, they should reassign the same to the trust company. 4. That plaintiff has a standing as suitor, because she is owner of 25,800 shares of the capital stock of the company. The answers admit the one time ownership of the security by the company, but avers that the assignment was for a full and fair consideration, and was regularly executed by the officers, who had full corporate authority so to do.

We shall endeavor to state, as concisely as possible, the facts not in dispute. One Levi H. Miller, prior to April 11, 1893, was the owner of the land mortgaged, and had been the owner for many years ; he was a man of considerable wealth, consisting of lands and personalty. In the latter part of the year 1892, Sutton, a son-in-law of Miller, purchased 30,000 shares of the capital stock of the Atkinson House Furnishing Company, a Maine corporation. The par value of the stock was $10.00 per share, or $300,000 ; the purchase price was $250,000. In part payment Sutton gave his promissory notes at four months in sum of $100,000, indorsed by his father-in-law, Miller. The corporation, with the aid of Sutton, procured these notes to be discounted in the regular course of business by a number of banks in Philadelphia, Camden and Wilmington. In March, 1893, before the notes matured, the House Furnishing Company failed. Immediately prior to the maturity of the notes Miller, by conveyance and assignment to several persons, put all of his property out of his possession. The land, which is the subject of the mortgage in dispute, he conveyed, on April 11, 1893, as before noticed, to one H. S. Rheiner, taking in payment the bond for $30,000, secured by the mortgage; this mortgage, seven days later, Miller assigned without consideration to one Joseph Cooper, who the next day assigned it to the Sussex Land and Cattle Company, the name of which company was afterwards changed to "The Real Estate Guarantee and Investment Company," in whose interest this suit is prose-

cuted.   At the same time Cooper transferred to the same company many other mortgages on land in Lancaster, Chester and Lebanon counties, which had come to him from Miller without consideration.   On the same day of the transfer of these securities by Cooper, April 19, 1893, the company issued to him 25,800 shares of its capital stock; this stock was held by him in trust for Miller, and was the whole capital stock of the company, except 400 shares held by one D. K. Joslin, general manager of the company, and five shares each held by the directors to qualify them to hold their offices.   The notes indorsed by Miller were protested for nonpayment; banks holding them employed Edward Dudley, Hoffecker and Sparhawk as counsel, who, acting together for the creditors, brought suit against Miller and Sutton, both in Philadelphia and in the courts of Delaware.   They obtained thirteen judgments in Delaware and ten in the courts of Philadelphia, the many banks that had become holders of the dishonored paper necessitating the many suits.   Miller having become a nonresident they instituted suits in foreign attachment in Lancaster, Chester and Lebanon counties, where his property was located, and levied upon it.   Also, under the act of 1819, attachments were issued on the judgments obtained in Philadelphia, and levied on the interest of Miller in the 25,800 shares of the Sussex Land and Cattle Company, in which proceedings Cooper was summoned as garnishee; he appeared by Mr. Ridgway, his counsel, and answered that he had no interest in the stock, but held the same for Miller.   Judgment was entered against him on his answers, execution issued, and the interest of Miller sold by the sheriff November 6, 1893, and purchased by the creditor banks.

After the failure of the House Furnishing Company, it was reorganized as the Furnishing Company, and stock in the new company of the par value of $240,000 delivered to trustees to be held in trust for Sutton, in settlement of his interest in the old company; Sutton's interest in this stock was also attached by the banks, sold, and purchased for their benefit by James Goodwin, trustee.

As the banks, by the purchase of Miller's interest in the stock held by Cooper, had become practically the owner of all but a small minority of the stock of the Sussex Land and Cat-

tle Company, that company, to relieve itself from its difficulties and transact business, opened negotiations with the banks, the creditors, for a settlement; the banks, wanting only their money, were equally willing; this resulted in a written agreement dated November 23, 1893, by which the banks agreed to surrender their interest in the stock and abandon their attachments if their debts were secured by the transfer to them as collateral by the company of over $100,000 of bonds, mortgages and other securities which had come into its possession from Miller when he denuded himself of his property. In pursuance of this agreement, first made verbally, but afterwards reduced to writing, the board of directors of the cattle company adopted a resolution which, after reciting the embarrassment of the company resulting from the litigation, and its inability to transact business while the litigation continued, goes on to state that the creditors had agreed to turn over to the company all of their judgments against Miller and Sutton, with their interest in the 25,800 shares of stock in the cattle company, and the shares of Sutton in the Furnishing Company, whereby the company would be enabled to eventually repay itself the $100,000 and all expenses and counsel fees of the creditors, which they demanded in settlement of their debts; then comes this concluding part of the resolution:

" Now, therefore, be it resolved, That the officers of the Sussex Land and Cattle Company are authorized and directed to purchase said judgments and all the above mentioned property and collaterals by giving its notes for the amount of said judgments, with interest and costs and all expenses and counsel fees which the said plaintiffs have incurred, payable at such times as said officers may deem proper, and can best arrange for the interests of the stockholders of this company; and in order to secure the due payment thereof to mortgage sufficient real estate and to assign a sufficient number of mortgages belonging to this company unto said plaintiffs or to their nominee or nominees."

It will be noticed that when this resolution was adopted, the creditor banks were by regular judicial proceedings practically the owners of 25,800 shares of the company; of the remaining shares issued, D. K. Joslin owned 400, and he had been active in bringing about the agreement and the adoption of the

resolution ; the directors, for purpose of qualifying, held fifteen shares between them.

In pursuance of the resolution, the president and secretary, with the corporate seal affixed, made the transfers of the collateral to the banks aggregating over $100,000 ; the company had delivered its notes to the three attorneys for the creditors, these defendants, each in the sum of $5,000, their fees, and also a note of $1,000 costs and expenses. The National State Bank of Camden held one of Sutton's notes in the sum of $8,261.84, and was a party to the purchase of Sutton's interest in the Furnishing Company ; the cattle company desiring to purchase this claim, it was not included in the $100,000 indebtedness ; so, to secure the counsel fees, expenses and this Sutton note, the mortgage and bond for $30,000 were assigned to Edward Dudley as trustee, he executing and filing a declaration of trust, setting out fully the consideration and his trusteeship. The mortgage not having been paid, and representatives of Miller remaining in possession, after a delay of nearly two years, sci. fa. was issued and judgment obtained ; when levari facias was issued, this bill was filed, and proceedings enjoined. After a hearing, the court below, both on facts and law, found for plaintiff, and decreed a reassignment of the mortgage.

So far as we have narrated the facts, we cannot discover any material dispute. On their face, they disclose nothing which should move a chancellor to destroy a written contract of assignment. But the learned judge of the court below, as an inference from the facts attending the adoption of the resolution for the assignment of the mortgage, is of the opinion that counsel for the creditors, these defendants, in collusion with Joslin, perpetrated a fraud upon the company, and therefore, as to the party defrauded, the resolution and the assignment are void. His first suggestion is that there was no consideration to the company for the payment of these fees ; in this he is clearly mistaken. The unavoidable conclusion from the testimony, the whole of it, and there is no possible other conclusion, is that Miller, after deeply involving himself by his indorsements for his son-in-law, and knowing after the failure of the House Furnishing Company that he must pay the notes which are about to mature, sought to cover up his prop-

erty, that it might not be reached by his creditors, which property was of much greater value than the aggregate amount of his indorsements. To this end he conveyed the larger part to Cooper, without a money consideration, and took from him bonds and mortgages; then, with Miller's approval, these securities were transferred to the cattle company, Cooper taking therefor 25,800 shares, nearly the whole issue of the capital stock of the company, and afterwards assigning them without consideration to this plaintiff, Miller's daughter. Almost the entire assets of the cattle company now consisted of the property of which Miller had denuded himself a few days before the maturity of the notes. Can the judicial mind doubt, from Cooper's answer to the attachment proceeding and the course of conduct of the parties, that Miller, Cooper and the company collusively sought to delay, hinder and defeat the efforts of Miller's creditors to collect their debts? Do men of the age and experience of Miller part with all their property, worth more than their debts, situate in several counties of two states, and put the whole proceeds in the stock of a company, the value of which stock is dependent wholly on a speculative future? And put it, too, in the name of Cooper, who paid nothing for it, and who was a mere straw man? That the cattle company sought to aid Miller in his dishonest purpose is not only palpable, but the evidence points to no other conclusion, not even remotely. Such, then, was the relation of the company to Miller when the creditors obtained their judgments, issued their executions, sold and bought the stock; then, by the foreign attachments in Lancaster, Lebanon and Chester counties, they seized the very property represented by the securities transferred to the company. As testified by one of the witnesses, the creditors had tied up nearly all the stock, as well as the company's assets; it could not move. Then came suggestions and negotiations for compromise. The banks wanted their money, $100,000, expenses and counsel fees; the company wanted its assets released and its stock unfettered; and this end, except the payment of the counsel fees and expenses, was actually reached by an agreement. Under the established facts, there was a moral as well as a legal consideration for the payment of the fees and expenses. The company had aided Miller in an attempt to cheat his creditors; morally, it

was bound to make whole to the creditors all their loss, which included debt and expenses. The creditors had practically become the owner of the stock and assets of the company; legally, they could demand for the relinquishment of their ownership such price as they chose ; if they demanded their debt of $100,000, their expenses and counsel fees to the amount of $16,000 added, their right to do so was clear, and the company, in agreeing to pay, got all it bargained·for, a valuable lot of property. The claim of want of consideration is wholly groundless.

Next, the learned judge suggests as a fact pointing to fraud that the counsel had rendered no bill to their clients for fees and expenses before demanding them from the company as part of the price of settlement; assuming this to be correct, the evidence shows that their clients directed them to demand their fees as part of the consideration; that they had rendered no bill, and their clients did not know the exact amount of their demands, if this were a fact, was no business of the company ; it was not their client; they had rendered it no professional service. The only question for its consideration was whether it could afford to pay the fees in addition to the debt ; the manager and directors of the company were not children, but grown men, familiar with business affairs. After consultation and deliberation they concluded to pay. That ended that matter.

Again, the learned judge is of the opinion that the circumstances preceding the adoption of the resolution by the board show collusion between the manager, Joslin, Bacon, the secretary, and the defendants, to perpetrate a fraud on the company. The testimony of Mr. Dudley, one of defendants, is to the effect that Mr. Ridgway, counsel for the company, had first framed the resolution, and the first draft did not include counsel fees ; when it was shown to him next day, and before it had been presented to the board for action, he objected to it in that form, and insisted it should be amended so as to cover counsel fees and expenses ; the question in dispute was, not whether a resolution to pay counsel fees should be adopted, but whether it should be embodied in the general resolution for the settlement or in a separate one. When he saw the resolution, there were present Joslin, the general manager, and Bacon, the secretary of the company, with Sparhawk and Hoffecker ;

Dudley, in the presence of all of them, interlined the resolution previously drawn by Ridgway, so as to include fees and expenses, and in that shape handed it to Joslin and Bacon for passage by the board.    Bacon testifies that he carefully read every word of it to the board, and it was adopted, and that in pursuance of it the president and secretary, with the seal of the company, assigned the mortgage to Dudley, the latter, at the same time, executing a declaration of trust to fulfil the purposes of the transfer.    Mr. Ridgway, the counsel for the company, was not present when the resolution was altered by Mr. Dudley, nor when it was acted upon by the board.    What significance should this fact have?    If the writing had been couched in technical legal terms, not likely to be understood by the board, there might have been some reason for requiring professional advice before adopting it.    But it was purely a business proposition. To consummate the arrangement previously made, should the company pay the debt of $100,000, or the debt and counsel fees and expenses, making $16,000 more?    Mr. Ridgway's professional acquirements could be of no aid to the board in answering such a question; it was simply for the board to decide on the price the company could afford to pay.    Of themselves, the ignorance of Mr. Ridgway of the terms of the altered resolution, and his absence from the second meeting of the parties when the form of it was changed, are facts of no significance. But why was he not there?    Mr. Dudley testifies that he twice suggested that Mr. Ridgway be sent for, but that Joslin, acting for the company, objected, giving as his reason that already Mr. Ridgway had been paid $2,000 fees, and if he knew that fees were to be paid by the company to the creditors' counsel, he would want additional fees; besides, he said, Mr. Bacon, the secretary, was a lawyer, and could give professional advice to the board if any were needed.    All of those present when the proposed resolution was altered, in substance, corroborate Mr. Dudley; Joslin and Bacon called on the side of the company, and Hoffecker and Sparhawk, the other two defendants; his testimony throughout bears the stamp of probability, and it is in substance affirmed by four other witnesses who had full knowledge of what occurred.    True, an attempt at concert of action there was, between those representing the company and defendants. but not fraudulent collusion.    Evidently, both par-

ties sought to reach the same end, an agreement which should stop the litigation and release the property held in the grasp of the creditors; to accomplish a purpose striven for by both, there was conference after conference, extending over months; concessions on one side, because of a yielding by the other on some point, and finally an assent by the company to the demand for fees and expenses. But there is not a spark of evidence that we can detect tending to show collusion to defraud the company. Nor does the intimation of the court that the fees were excessive have any bearing on the question at issue. If so large as to make the price for the purchase of the impounded assets too great, the company was not compelled to pay them. Whether the institution of legal proceedings in two states, obtaining judgments in half a dozen courts, and seizures and sales of nearly $200,000 worth of property, and securing for their clients the payment of debts to the amount of $100,000 put in peril by the fraudulent collusion of the debtor and the company, warranted counsel in a charge of $5,000 each for services, is wholly outside the question; for such demand, in no view of the evidence, is fraudulent or indicative of fraud. That the declaration of trust by Dudley includes a note held by the National State Bank of Camden drawn by Joslin and indorsed by Sutton in the sum of $8,700 is also outside the case; neither the bank, Sutton nor Joslin is made a party to this bill, and neither has been heard. It is a somewhat summary proceeding to strike down a security of this character, without notice to the parties really interested. The trustee, personally, had no interest in the $8,700. It represented a note given by Joslin, the manager of the cattle company, to Sutton, Miller's son-in-law, and indorsed by the latter,—then discounted by the National State Bank of Camden; it was protested—the bank obtained judgment. It alleges that it should be protected as to this note before joining in a surrender of the property to the cattle company, and the directors included it in the debts to be paid by the assignment of the Rheiner mortgage to Dudley. The bank could exact such terms as it chose before relinquishing a right; the company was not bound to concede the terms. The whole substance of its plea now is that the bank drove a hard bargain; perhaps so, but hard bargains are not of themselves sufficient to strike down the most solemn written instru-

ments executed by sane business men. But further, this fact, apparently, is out of the case, because it was stated in the court below and at the bar here, and not denied, that Joslin afterwards paid the full amount of the note to the bank. If that be the fact, then the trust in Dudley to pay over to the company all of the mortgage in excess of the $16,000 fees and expenses is binding upon him and enforceable in the court below.

It was argued in the court below that the lands conveyed by Miller, and which since 1873 stood in his name of record, were his wife's, and the ostensibly fraudulent transfer was but an effort to prefer his wife as a creditor. Although the court seems to credit this, there was no evidence worthy the name to support this view. Sutton undertakes to state what he had heard, that the farm bound by this mortgage had come to Mrs. Miller from her father, Jacob Erb. But titles to property are not settled by such statements, and it is well they are not.

The court is further of the opinion that, under the proceedings by attachment resulting in the sale of Miller's interest, no title passed to the creditors, and therefore they had nothing to give the company as a consideration for the purchase price. Assuming this to be correct, both parties treated the title as having vested in the creditors; the right of the latter was sufficiently probable to warrant litigation to judicially establish it; pending such litigation, the title was as effectual to arrest the business of the company as if it had been unquestioned. It has been decided over and over in this state that the surrender of a doubtful claim or right is a good consideration for a contract; therefore, the absence of an undisputed title in the creditors was an immaterial fact.

As to the authority of the board of directors of a corporation to make such a contract, which the court elaborately denies, citing general principles as to the corporate power of a board of directors in support of its view, the entire opinion in this particular is based on a misconception of the facts. All the assets of the company, as well as nearly all its stock, were seized and held by the creditors; for the time being, at least, the corporation was powerless to move; a future judicial determination might establish beyond controversy the right of the creditors; if the corporation had the power, fraudulently as to the creditors, to take over the entire assets of Miller, it clearly had

the power to make restitution, or to compound its wrong by retaining the assets and making whole the wronged party. It had no corporate assets worth speaking of, except those it had obtained in fraud of the creditors. Every step it might have taken to use these assets for its own benefit would have been a great wrong to the creditors. Is there any rule of law or equity that will permit it to hold all this dishonestly obtained property, and then claim that the agreement for restitution of a part of its value is ultra vires? No court has ever so decided. If the company had tendered back all it had got by its bargain, it might have set up the plea of ultra vires as to the contract for payment of fees and expenses; but it would be iniquitous to affirm the bargain for what it got and revoke it for what was agreed to be paid. The plea of ultra vires, in view of the facts, cannot avail it.

We have not taken up the rulings of the court below in their regular order and disposed of them, because we have tried not to wander from, but to confine ourselves to, the issue; we have said enough to indicate our opinion that the court was misled by immaterial outside facts into wholly unwarranted inferences, and was thereby impelled to an erroneous decree.

The only issue raised by the bill and answer was whether the assignment of the mortgage to Dudley to secure counsel fees and expenses was to that extent valid. As it was made by the authority of the board of directors for an ample consideration, without any evidence of fraud or overreaching on part of defendants, we hold it good as against the corporation which received and still holds a full consideration therefor, and as a consequence, good as to this plaintiff. As the inferences of fact by the learned judge are wholly unwarranted, the law cited and declared by him has no application.

The decree is reversed, the injunction is dissolved, and bill dismissed at costs of appellee.